**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LORI WADE,                                         No. C-09-01976 JCS

            Plaintiff,                             **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      v.

UNITED STATES OF AMERICA,

            Defendant.

_____/

## I.      INTRODUCTION

This case involves a tragedy that occurred on July 13, 2007, when a container ship collided with a fishing vessel off the coast of Point Reyes, California, resulting in the death of Paul Alan Wade, a commercial fisherman who was alone on the vessel at the time of the collision.  Plaintiff Lori Wade, individually and as personal representative for the estate of Paul Wade, brings this wrongful death and survival action under the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 30901, *et seq.*, and the Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 30301, *et seq.*  Plaintiff's claims are based on the alleged negligent rescue efforts of the Coast Guard following the collision.

Between March 12, 2012 and March 15, 2012, the Court conducted a non-jury trial on this matter.  Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law.

## II.     FINDINGS OF FACT

1.       In the summer of 2007, Paul Wade was working as a commercial fisherman on the F/V BUONA MADRE ("the Buona Madre"), a wooden hulled fishing boat built in the 1930s that he had purchased in 2006.  Mr. Wade had worked as a commercial fisherman for only two seasons.  Previously, he had worked for many years as a purchasing manager, but after he was terminated by

his last employer, a government contractor at Moffet Field in Silicon Valley, he brought a "whistle-blower's" lawsuit and ultimately settled that suit for a lump sum cash payment.   He used the proceeds of that settlement to buy the Buona Madre and pursue his longtime dream of working as a commercial fisherman.

2.      Paul Wade had two biological children, Alexander Wade and Sarah Wade, who were adults at the time of his death.  Nathan Rose, Kate Smith, and Stephanie Rose are the adult biological children of Paul Wade's wife, Lori Wade; they were never formally adopted by Paul Wade.

3.      On the afternoon of July 13, 2007, the day before Mr. Wade's body was found floating offshore, a 291-foot foreign-flagged freighter, the M/V EVA  DANIELSEN ("the Eva Danielsen"), was outbound from San Francisco Bay for Portland, Oregon.  At all times material hereto, the Eva Danielsen was reporting her movements to Coast Guard Vessel Traffic Service, San Francisco ("VTS").  The primary mission of VTS is to provide advisory services to commercial shipping and to promote the safe navigation of vessels in and out of San Francisco Bay.

4.      Sometime around 1640,[1] the Eva Danielsen passed abeam of Point Reyes in the Northern Outbound Traffic Lane on a base course of 303 degrees with her Master, Capt. Marin Matesic, and her Second Mate, Zeljko Sliskovic, on the bridge.  Conditions off Point Reyes were mild but foggy. The wind was out of the northwest at 7 knots and the seas were 2 to 3 feet high with observed waves up to 6 feet.

5.      Although the fog had reduced visibility to less than a quarter mile, the Eva Danielsen was making 12.1 knots, had no dedicated look-out posted, and was not sounding any fog signals.

6.      Between the commercial fleet, the sport fleet, and the recreational fleet, there were around 200 vessels in the waters off Point Reyes that afternoon.  These included fishing vessels, like the Buona Madre, fishing for salmon.  VTS was aware that it was salmon season and that there were fishing vessels in the area because for approximately two weeks before July 13, 2007, it had been receiving reports of fishing vessels in the shipping lanes.

---

[1]Because there are discrepancies in the time stamps in the recorded transmissions, the times stated in the Court's findings of fact are approximate.

United States District Court

For the Northern District of California

7.      At about 1642, the Eva Danielsen reported her position to VTS over VHF Channel 12 and indicated that she intended to leave the Northern Outbound Traffic Lanes on a heading of 324 degrees at a speed of 12.1 knots.

8.      At about 1700, VTS received a radio transmission from Brian Stacy, operator of F/V MARJA ("the Marja").  Stacy reported that he was attempting to hail a ship exiting the Outbound Northern Traffic Lane.  VTS mistakenly identified F/V Marja as F/V "Martha," reported that "the freight ship Eva Danielsen [had] just cleared the Northern Outbound Traffic Lane[,]" and instructed the two vessels to communicate directly with one another.  *Id.*  At that time, according to a written statement by the Second Mate provided a few days later, there were "plenty" of  fishing vessels on the radar screen, "but two 2 fishing vessel [were] starboard side" of the Eva Danielsen.

9.      Fishing vessels are exempt from reporting to VTS and VTS could not see vessels on radar in the area where the relevant events occurred.

10.     Sometime around 1705, Capt. Matesic left Second Mate Sliskovic alone on the Eva Danielsen's bridge.  At about 1710, after making passing arrangements with the Marja over Channel 12, Second Mate Sliskovic altered the Eva Danielsen's course to 329 degrees in order to pass astern of the Marja.  In a written statement provided a few days later, when the Eva Danielsen had reached Portland, Oregon, Second Mate Sliskovic described what occurred as follows:

> I made deal with [Marja] that I will pass astern of [Marja].  In that moment I was [the] only [one] on the bridge, and 1710 I altered course to 329 and lose signal on the [Marja].  Few minutes later I saw mast little bit ahead of the [unintelligible] vessel and immediately advised master by phone and I said that I think that I hit, but not feel nothing. . . .When I altered course in 329 [degrees] it was all clean on the radar.  I plan[n]ed to pass aft of [Marja] and on the screen of radar my starboard side was clean. . . .

11.     Paint scrapings taken from the bulbous bow of the Eva Danielsen a few days later, when it reached Portland, Oregon, were found to be similar to paint from debris from the Buona Madre.

12.     The preponderance of the evidence shows that the Eva Danielson had, in fact, hit the Buona Madre.

13.     At or about 1718, Capt. Matesic returned to the bridge, spoke with Second Mate Sliskovic, and notified VTS over Channel 12 that: "It looks like we hit fishing vessel."  Capt. Matesic further

3

1   reported that the Eva Danielsen had returned to the scene of the suspected collision, stopped her

2   engine, and begun searching for wreckage and survivors but saw nothing.

3   14.      Capt. Matesic's initial report was received by Vessel Traffic Management Specialist Leonard

4   Newsom.  Although Mr. Newsom was working at VTS as a civilian employee on July 13, 2007, he

5   had spent 10 years on active duty with the Coast Guard and had trained and served as a duly

6   qualified Search and Rescue ("SAR") controller.  Mr. Newsom handled all direct communications

7   between the Coast Guard and the Eva Danielsen on the afternoon of July 13, 2007.

8   15.      The Standard Operating Procedure Manual for U.S. Coast Guard Sector San Francisco

9   Command Center ("SOP Manual"), § 7.4.3.d., instructs Sector San Francisco SAR controllers to

10  "[a]sk the reporting source to remain on scene until a Coast Guard resource arrives or to provide

11  more information as the situation progresses.  Consistent with that provision, Mr. Newsom directed

12  Eva Danielsen to "standby."

13  16.      In his initial report to VTS, Capt. Matesic told VTS that his Second Mate had made the

14  passing arrangement with the Marja.  In a later transmission, Capt. Matesic told VTS that he had not

15  been on the bridge at the time of the suspected collision because he had left for a few minutes to go

16  to the toilet.  It is undisputed that noone at VTS asked to speak directly to the Second Mate.

17  17.      It is usual for the Coast Guard to speak to whichever ship's officer is on the bridge.  Under

18  the circumstances here, where the Second Mate was on the bridge when the suspected collision

19  occurred, the best source of information likely would have been the Second Mate rather than the

20  Master (who was not on the bridge at that time).  However, Plaintiff's expert witness conceded that

21  it is "not inappropriate" for VTS or SCC to talk to the Master about what his seamen have told him

22  about the condition of the ship.

23  18.      Within a minute or two of Capt. Matesic's initial transmission, Mark Perez, the civilian

24  Watch Supervisor on duty at VTS, relayed an account of that transmission to the Sector San

25  Francisco Command Center ("SCC" or "the Sector") over the telephone.

26  19.      Like VTS, SCC is situated on Yerba Buena Island. SCC is the "nerve center for Sector San

27

28                                                    4

Francisco." Among other things, it is responsible for the coordination and tactical control of all SAR operations within the Sector's area of operations ("AOR").

20.     On July 13, 2007, SCC was under the ultimate direction of Capt. William Uberti, the Commander of Sector San Francisco and its designated SAR Mission Controller ("SMC"). The SMC is responsible for the coordination and tactical control of all SAR operations within the Sector's AOR. SCC was under the direct command of Lt. Cmdr. William Copley, the Command Center Chief. Lt. Cmdr. Copley was also SCC's senior duty officer. Lt. Cmdr. Copley was at his home in Benecia, California when SCC received the initial report.

21.     There were four people on watch at SCC when word of Capt. Matesic's initial report came in: 1) Sector Duty Officer ("SDO") Lt. Aja Kirksey; 2) Operations Controller ("OC") Mr. Joseph Ford; 3) Situation Controller Petty Officer Christopher O'Donnell, and; 4) Communications Controller Petty Officer Jessica LaRue.

22.      Mr. Perez spoke to Petty Officer O'Donnell when he telephoned SCC with word of Capt. Matesic's initial report. Petty Officer O'Donnell told Mr. Ford about Capt. Matesic's initial report shortly after hanging up with Mr. Perez. As the OC, Mr. Ford was responsible for leading the watch team in prosecuting all SAR missions.

23.     The SOP Manual provides at § 7.4.3(b)(2) that "[w]henever possible, phone calls from reporting sources will be joined via conference call with . . the unit responsible for prosecuting the case." However, "[i]f . . . the unit receiving the call feels that they are in a better position to take the information . . . that unit will gather as much information as possible and pass it on to SMC."

24.     Mr. Ford did not contact the Eva Danielsen directly but instead relied on VTS to conduct all direct communications with the Eva Danielsen and the other reporting sources off Point Reyes. SCC and VTS communicated over a "Tandberg" video link, which enabled SCC to see, hear, and speak with VTS personnel but did not permit SCC to see, hear, or speak with any of the reporting sources off Point Reyes. VTS also did not have the capacity to patch its radio communications with the Eva Danielsen directly through to SCC. Mr. Ford did not believe it was necessary to contact the Eva Danielsen directly because he believed SCC had reliable communications with the Eva Danielsen

United States District Court

For the Northern District of California

5

1    through VTS.  Although he did not know who Mr. Newsom was communicating with, he understood

2    that Mr. Newsom was talking with "someone who was on the bridge."

3    25.    Around 1720, Mr. Newsom hailed the Eva Danielsen at Mr. Perez's direction and inquired

4    whether Capt. Matesic thought that the vessel that he had collided with was the one that he had made

5    passing arrangements with, referring to that vessel as "the Martha."  Capt. Matesic responded in the

6    affirmative.  Again acting at Mr. Perez's direction, Mr. Newsom then made a series of  "call outs" to

7    the "Martha" over Channels 12, 13, and 16.

8    26.    Lt. Cmdr. Copley was notified of the potential collision by Lt. Kirksey, who called him at

9    1725.  Lt. Kirksey told Lt. Cmdr. Copley that a possible collision had occurred, and Lt. Cmdr.

10   Copley told Lt. Kirksey that he would accept responsibility for briefing Capt. Uberti and Cmdr.

11   DeQuattro so that she could devote all of her attention to managing the case.

12   27.    After hanging up with Lt. Kirksey, Lt. Cmdr. Copley telephoned Capt. Uberti and repeated

13   the information he had received from Lt. Kirksey.  Capt. Uberti was in his office, in the same

14   building as SCC, and would remain there until sometime after 1800.  Neither Lt. Cmdr. Copley nor

15   Lt. Kirksey was ever able to reach or brief Cmdr. DeQuattro.

16   28.    At or about 1726, Mr. Ford telephoned Air Station San Francisco, told the personnel there

17   about Capt. Matesic's initial report, and directed them to prepare a rescue helicopter for launch.  The

18   helicopter ultimately did not get underway because the case was concluded before the helicopter got

19   off the deck.  It is possible the helicopter would not have been able to get underway due to fog, but

20   at trial Mr. Ford was unable to say for sure whether the fog that day would have prevented the

21   helicopter from becoming airborne.

22   29.    At about 1737, VTS issued an Urgent Marine Information Bulletin ("UMIB").  According to

23   § 13.1.1.2.b. of  the SOP Manual, a UMIB is to be issued "as soon as possible" upon receipt of any

24   distress call.  The purpose of a UMIB is to alert the boating public that the Coast Guard has received

25   a distress call and to enlist their assistance if they are in the immediate area.  The SOP Manual

26   indicates that it is SCC's task to prepare the UMIB, using a UMIB worksheet, and to issue the

27   UMIB, repeating every 15 minutes "or as directed by the controller;" SCC is to fax the worksheet to

28                                                6

United States District Court

For the Northern District of California

VTS as well, so "they can broadcast the same information on other channels."  Instead, the UMIB in this case was initiated by Mr. Lopez, of VTS.

30.      The UMIB indicated that the Eva Danielsen had been involved in "a possible collision" with the "fishing vessel Martha" off Point Reyes, gave the coordinates that had been reported by Capt. Matesic, and urged all vessels "to keep a sharp lookout for this vessel" and to "provide assistance if possible."

31.      After hearing the UMIB, Coast Guard Station Golden Gate telephoned SCC and asked Mr. Ford if he wanted them to launch any rescue assets.  Mr. Ford replied that the scene of the suspected collision lay just outside Station Golden Gate's AOR and advised them that he "was getting ready to call Station Bodega Bay[.]"  Station Golden Gate responded: "Okay, we're on standby if you need another vessel out there."

32.      As soon as Mr. Ford got off the phone with Station Golden Gate, Station Bodega Bay telephoned Mr. Ford, informed him that they too had heard the UMIB, and inquired whether SCC wanted them to launch any assets.  Mr. Ford instructed them to do so.  Personnel at Station Bodega Bay therefore hit the SAR alarm.  Station Bodega Bay had three rescue assets available and ready for launch at that time: the motor life boat ("MLB") 47305, the MLB 47247, and the "25-footer" 25592.  Station Bodega Bay launched MLB 47305 at 1740 and held the other two vessels in reserve.

33.      MLB 47305 is "a 47-footer" with a maximum speed of about 25 knots.  Her coxswain, Petty Officer Nathan Burns, was an "elite" Coast Guard "surfman" with extensive SAR experience.  The coordinates that Capt. Matesic gave VTS were approximately 18 miles south of Station Bodega Bay. Petty Officer Burns testified that the MLB 47305 could have reached those coordinates "sometime before 1840."

34.      The Coast Guard's 87-foot patrol boat Hawksbill was Sector San Francisco's designated "alpha" boat on the afternoon of July 13, 2007.  She was therefore underway and on patrol outside the Golden Gate at the time of Capt. Matesic's initial report.  After overhearing the UMIB issued by VTS, Hawksbill diverted from her patrol and shaped a course for the coordinates given by Capt.

1   Matesic. The Coast Guard's Board of Investigation concluded that Hawksbill could have reached

2   those coordinates in 90 minutes or sometime around 1900.

3   35.      Concerned that the Coast Guard was "focused primarily" on the vessel "Martha" and

4   wanting "to press a little further," Lt. Kirksey directed Mr. Ford to ask VTS to hail the Eva

5   Danielsen again and "find out what made them think there had been a collision."

6   36.      Acting at Mr. Ford's and Mr. Perez's direction, Mr. Newsom hailed Eva Danielsen and

7   asked:

8       Can you give us an indication as to why you may think you may have collided with this
        vessel?  Was there a noise?  Did your vessel have a shudder?
9

10  Capt. Matesic responded:

11      Negative.  The moment of this occurrence, I just few minutes ago left bridge[].  Second mate
        remained on bridge and he make arrangements with this fishing vessel, and then maybe – I
        did not hear nothing.  He just told me immediately that he may be run fishing vessel.  Maybe
12      she was close under bow.

13  Mr. Newsom then inquired:

14      Did you have this vessel on radar prior to making passing arrangements and then lost it from
        the radar?
15

16  Capt. Matesic answered:

17      Yes, that's correct.  That's correct.  Vessel was on radar.  Second mate made arrangements
        and then lost it from the radar.

18  Capt. Matesic did not state that his second mate had actually seen a mast a "little bit ahead" just

19  before the suspected collision.

20  37.      VTS  repeated Capt. Matesic's responses to SCC, over the Tandberg, and this led Lt. Kirksey

21  and Mr. Ford to conclude that no one aboard the Eva Danielsen had "felt anything or seen anything"

22  to suggest she had hit a fishing boat and that her report of a possible collision was based solely on

23  the facts that the ship had lost radar and radio contact with a vessel "Martha" shortly after making

24  passing arrangements with her.

25  38.      At or about 1739, VTS broadcast a "SECURITE" over Channel 12 requesting "[a]ny fishing

26  vessels in the vicinity of Point Reyes [to] contact VTS on Channel 12."  A SECURITE is "a step

27

28                                                    8

below" a UMIB and is ordinarily issued by the Coast Guard to request information about a distress situation from people on the scene.

39.     While VTS was communicating with the Eva Danielsen and broadcasting the SECURITE, Mr. Ford was drawing up "search action plans" for MLB 47305 and the rescue helicopter.

40.     Several fishing vessels, including Kay Bee, Mary F, Kandi Dawn, and the Marja responded to the SECURITE. Their responses made it clear to VTS that some of those fishing vessels were located within two miles of the coordinates given by Capt. Matesic.

41.     Several of the responding fishing vessels notified VTS over Channel 12 that they were ready, willing, and able to join the search. Allen Loretz, operator of F/V Kandi Dawn, radioed VTS that "my crew member's rolling up our gear here, and we're going to be over in a second." Robert Maharry, operator of F/V Mary F, radioed VTS, "I've got to go stack up my gear," and exhorted his fellow fishermen over Channel 12 that "we got to go look for this guy, everybody." After overhearing Maharray's exhortation, Benjamin Platt, operator of F/V Kay Bee, hauled up his own fishing gear and headed towards the site.

42.     In the meantime, Capt. Matesic and the Eva Danielsen remained near the scene of the collision awaiting furtherinstructions from the Coast Guard.

43.     After one of the fishermen informed VTS over Channel 12 that the vessel the Coast Guard had been calling "Martha" was actually named "Marja," Brian Stacy, the Marja's operator, "joined the conversation," advised VTS that the Eva Danielsen had passed safely astern of him "twenty to thirty minutes" earlier, and reported that he could still see her hove to about a mile and a half from his position.

44.     Once Stacy had reported in, another fisherman observed over Channel 12 that:

> It must be another boat then, Brian, the ship hit a boat. He thought it was you because you talked to him.

45.     Stacy responded that "there was two of us within a half mile there and he went between us." Stacy identified the second vessel as the Rogue and stated that he didn't "think there was too many

United States District Court

For the Northern District of California

1  other fishing vessels up there." A few minutes later, someone notified VTS over Channel 12 that

2  Rogue too was safe. Stacy then stated:

3      It appears everything's fine. I know I'm fine and it looks like they're fine and I don't have
       any dots on the radar above us, not that close, so I think it was a false alarm. Everybody's

4      fine.

5  Around this time, Capt. Matesic, who was also part of the conversation on Channel 12, suggested

6  that it might have been a "false alarm."

7  46.    When VTS advised SCC of these developments, Mr. Ford and Lt. Kirksey concluded that

8  they had found "what [they] were looking for," that "it would be safe to stand down the responding

9  assets." Mr. Ford took "a tally on the watch floor" to determine whether Petty Officer O'Donnell

10 and Petty Officer LaRue agreed with his and Lt. Kirksey's conclusions. They did.

11 47.    Lt. Kirksey then telephoned Lt. Cmdr. Copley to brief him on these developments. Lt.

12 Kirksey reported that SCC had identified and located the Marja and her operator, that they were safe,

13 and that "based on this information she was recommending that [the Coast Guard] stand down." Lt.

14 Cmdr. Copley asked Lt. Kirksey why the Eva Danielsen believed it had hit another vessel and Lt.

15 Kirksey responded that there was no other sign of a collision except that the Eva Danielsen had

16 made passing arrangements with another vessel and then wasn't able to get in contact with that

17 vessel. Based on the information he received from Lt. Kirksey in the course of this telephone call,

18 Lt. Cmdr. Copley concurred with Lt. Kirksey's recommendation.

19 48.    After hanging up with Lt. Cmdr. Copley, but before briefing Capt. Uberti, Lt. Kirksey

20 directed Mr. Ford to stand down the Coast Guard assets.

21 49.    At about 1746, Mr. Ford telephoned Air Station San Francisco and cancelled the launch of

22 the helicopter.

23 50.    Sometime at or shortly before 1746, Mr. Newsom, acting at the direction of Mr .Perez, hailed

24 the Eva Danielsen and advised her over Channel 12:

25      [I]f you believe that there is no other reason for you to continue searching, Coast Guard no
       longer believes that there is any indication of distress. You are clear to proceed on your

26      journey.

27

28                                                    10

1   The Eva Danielsen heard and acknowledged this transmission, got back underway, steadied up on a

2   course of 235 degrees, and resumed her voyage to Portland at a speed of 11.7 knots.

3   51.       The fishermen who had previously rolled up their gear to join in the search also stood down

4   after overhearing this transmission.  Fisherman Bob Mr. Maharry, for example, testified that when

5   he heard the transmission, he asked, "are you sure?" and tried to get confirmation that there was no

6   distress call.  When he was told that the "all clear, stand down" had been given, he went back to

7   work, "kind of reluctantly."  Similarly, fisherman Benjamin Platt testified that "once it had been

8   reported that all the known vessels were accounted for," he turned around and returned to Drake's

9   Bay Anchorage.

10   52.       Having overheard Mr. Newsom's transmission that the "Coast Guard no longer believes that

11   there is any indication of distress[,]" Station Bodega Bay telephoned SCC, spoke with Petty Officer

12   LaRue, and asked her if it could "get a correct lowdown on what's going on."  Petty Officer LaRue

13   replied that:

> Vessel Traffic Service was able to get a hold of this vessel, the fishing vessel.  They went out
> and put a SECURITE out to all the fishing vessels on the frequency and the vessel Marja, not
> Martha, rogered up and said, yes, we're aware of the vessel that made passing arrangements
> with the freight vessel and they were OK.  So we stood everyone down.

17   Station Bodega Bay therefore radioed MLB 47305 and directed her to return to base.

18   53.       At 1750, SCC also stood down the cutter Hawksbill.

19   54.       At about 1800, Lt. Kirksey went to Capt. Uberti's office and briefed him on these

20   developments.  After a short discussion, Capt. Uberti ratified her decision to stand down.

21   55.       The SOP Manual, § 7.4.3(b), provides that Sector OCs "shall make every effort to gather as

22   much information as possible concerning each [SAR] case."  To that end, SOP guidelines require

23   that a SAR checksheet be used to record information relating to SAR events.  Neither VTS nor SCC

24   completed a SAR checksheet in connection with the events of July 13, 2007, however.

25   55.       Sunset occurred at 2036 on July 13, 2007.  Civil twilight ended at 2106.

United States District Court

For the Northern District of California

56.     At 0839 the following morning, July 14, 2007, F/V CALIFORNIA GIRL ("the California Girl") came across Paul Wade's body seven miles off Point Reyes "in roughly the same area as the initial report of the collision" the day before.

57.     The California Girl did not take the body alongside; it did not take the body on board; and its crew made no attempt to resuscitate the person who was later identified as Mr. Wade.

58.     Paul Wade's body was recovered by the crew of MLB 47305 at about 1030 on July 14, 2007 and brought back to Station Bodega Bay.

59.     When the Coast Guard arrived, they found the body clad in a Type I Personal Flotation Device ("PFD"). The PFD's alert whistle was out of its pocket and the battery powered, manually activated flashlight was illuminated.[2] Mr. Wade's head was elevated, erect, and out of the water.

60.     The body was floating amidst a debris field made up of wreckage from the Buona Madre. It was not entangled in that debris in any way.

61.     After conducting an autopsy, the Sonoma County medical examiner concluded, and the parties have therefore stipulated, that Paul Wade died by drowning. The parties have also stipulated that the exact time of Paul Wade's death cannot be proven.

62.     The medical experts who testified at trial offered two possible scenarios for Paul Wade's drowning: either he was entrapped or entangled aboard the Buona Madre and dragged under water at the time of the initial collision, before there was any chance for a rescue, or he survived the initial collision and drowned in his life jacket as many as 6.9 hours later by aspirating seawater when his

_____

[2]Neither party adduced any direct eyewitness testimony establishing whether the light was on or off. Petty Officer Burns, the coxswain in charge of MLB 47305, testified at trial that he saw the body in the water on the morning of July 14, 2007 but that he could not recall "one way or the other" whether the light was on. Further, none of the contemporaneous witness statements that the Coast Guard took from MLB 47305's crew addresses this issue. However, the contemporaneous witness statement of Petty Officer Jon Gagnon, the Command Duty Officer ("CDO") of Station Bodega Bay, reports that "Mr. Wade was wearing a type 1 life jacket with an activated distress light when picked up by the crew of MLB 47305." Petty Officer Burns, moreover, testified that CDO Gagnon interviewed Burns and MLB 47305's entire crew as soon as they returned to Station Bodega Bay on the morning of July 14, 2007, "to obtain a complete understanding of what had transpired during" their mission. Petty Officer Gagnon's witness statement is a "public record[] [or] report[]" within the meaning of F.R.E. 803(8)(C). Petty Officer Gagnon's statement also qualifies as a "recorded recollection" under F.R.E. 803(5). Therefore, the Court concludes that Petty Officer Gagnon's witness statement is admissible and DENIES the Government's motion to strike that statement.

12

United States District Court

For the Northern District of California

airways were gradually and repeatedly swamped by wave action after he had succumbed to the debilitating effects of immersion hypothermia.

63.     The Government's pathologist, Dr. Terri Haddix, testified that she favored the entrapment scenario but conceded that she could not say "to a reasonable degree of medical probability" which of these two scenarios "was, in fact, the one that occurred[.]"  Dr. Haddix also conceded that she could not say the autopsy had produced any anatomical findings that were consistent with or even suggestive of a life or death struggle in an entrapped space or entangled circumstances underwater. She admitted that the autopsy revealed that Paul Wade's body displayed some relatively minor abrasions and lacerations, and some "trivial" blunt force injuries, but that it bore no sign of any significant blunt force trauma.

64.     The Government's cold water survival expert, Adm. Steinman, pointed to "the huge amount of fluid" found in the victim's lungs, in support of his opinion that Paul Wade must have drowned after suffering a prolonged and total submersion "shortly after or during" the collision.  He based his opinion on the belief that Mr. Wade could not have aspirated enough seawater to drown while wearing a Type I PFD, even if he had been immersed in those seas long enough to have suffered the debilitating effects of hypothermia.  This opinion was contradicted, however, by  Plaintiff's undersea medical expert, Dr. Paul Cianci, who testified that the amount of water was consistent with drowning after a prolonged period in the water because inhalation of salty water results in edema, wherein the salt level of the water causes fluids from the blood to enter the lungs through the lung walls.  Adm. Steinman's opinion was also undercut by an inconsistent position in an article that he previously coauthored, in which he stated as follows:

> To maintain airway freeboard and to avoid drowning, the survivor must posses the physical skills and psychological aptitude to combat the effects of wave action.  Although a PFD assists in maintenance of airway freeboard, waves can still submerge a survivor's' head, even in moderately calm seas.[3]

---

[3]"Airway freeboard" is the distance between the level of the water and the immersed person's oral-nasal cavities.

United States District Court
For the Northern District of California

1   Therefore, the Court rejects Adm. Steinman's opinion that because Paul Wade was found in a Type

2   1 PFD he must have drowned at the time of the collision or soon thereafter.

3   65.      According to Version 2.2 of the Cold Exposure Survival Model, which the Coast Guard uses

4   to calculate the likely survival times of persons immersed in cold water, an individual immersed in

5   seas and circumstances like those Paul Wade encountered on the afternoon of July 13, 2007, could

6   have survived up to 6.9 hours before succumbing to hypothermia.  Such an individual would likely

7   lose functional abilities, including his ability to keep his back to oncoming seas and/or keep water

8   from splashing into his airways and lungs, in about 3.8 to 3.9 hours.

9   66.      Even when the victim is floating on the surface in a Type I PFD, the ability to avoid

10  drowning after being debilitated by hypothermia is a function of the sea state and the victim's

11  "airway freeboard."  The seas throughout the late afternoon, evening, and night of July 13, 2007

12  remained steady at 2 to 3 feet with observed waves of up to 6 feet.  Mr. Wade's likely airway

13  freeboard in a Type I PFD was 4 to 6 inches.

14  67.      Dr. Cianci opined that Mr. Wade probably drowned in his life jacket after succumbing to the

15  jaw slacking effects of immersion hypothermia.  The doctor therefore testified "to a reasonable

16  degree of medical probability," that Mr. Wade was  still alive at 1746 when the Coast Guard

17  broadcast its mistaken conclusion that there was no vessel in distress, and was likely still alive both

18  at 1830 when the first Coast Guard assets would have reached the scene, and at 2100 when civil

19  twilight fell (although the doctor admitted that this would be on the "outer edge" of the victim's

20  likely survival time).  The Court finds Dr. Cianci's testimony to be credible and persuasive.

21  68.      Though a close call, the Court finds it more likely than not that Paul Wade was not drowned

22  as a result of entrapment at the time of the collision but rather, that he was alive when he entered the

23  water and drowned after a longer period of time  – at least 2 to 3 hours – as a result of hypothermia.

24  In reaching this conclusion, the Court  finds particularly significant the evidence that the battery-

25  powered flashlight that was found on Paul Wade's PFD had been turned on.  As the primary purpose

26  of activating such a light is attracting rescuers in the dark, and since the collision occurred during

27  daylight, it is unlikely that Paul Wade would have had the need, the time, or the presence of mind to

28                                                  14

twist his rescue light to the "on" position at the time of the collision (or just before).  Rather, it is more likely that he turned on the flashlight sometime after he entered the water.  As he apparently had the manual dexterity to turn on the flashlight once in the water, the most likely scenario as to Mr. Wade's death is that he drowned in his life jacket after aspirating seawater when his airways were swamped by wave action once he had succumbed to the debilitating effects of immersion hypothermia.

69.    The Court further finds that it is more likely than not Mr. Wade would have been found alive and rescued had the Coast Guard not stood down its assets and broadcast that there was no vessel in distress.  The Court's conclusion is based on evidence that: 1) Coast Guard assets, including the Hawksbill and Station Bodega Bay's MLB 47305 could have been on the scene in under two hours; 2) the Eva Danielsen was directly on the scene and could have assisted; 3) there were many fishing vessels that were close by (some as close as two miles away) and ready to assist in search and rescue efforts; and 4) despite low visibility, civil twilight did not end until 2106.

## III.    CONCLUSIONS OF LAW

1.    This case presents an admiralty and maritime matter within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, against the United States of America, which has waived its sovereign immunity and consented to suit herein, if at all, under the terms of the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 30901, *et seq.*

2.    Plaintiff has alleged negligence on the part of the United States Coast Guard in conducting a search and rescue operation, which allegedly caused or contributed to the death of her husband in navigable waters off northern California.

3.    As such, this case is governed exclusively by the provisions of the Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 30301, *et seq.*, which prescribes both the nature of the damages which can be awarded and the proper beneficiaries of any such recovery.  Section 30302 of DOHSA requires that the personal representative of the estate may bring the action and only for the spouse, parent, child or dependent relative of the deceased.  Section 30303 specifies that only pecuniary damages are recoverable.

United States District Court

For the Northern District of California

4.      "The law of admiralty has always sought to 'encourage and induce men of the sea to go to the aid of life and property in distress.'"  *Berg v. Chevron U.S.A., Inc.,* 759 F.2d 1425, 1429 (9th Cir. 1985) (quoting 3A M. Norris, Benedict on Admiralty § 234 (7th ed. 1980)).  In order to encourage emergency rescues, "liability for negligent salvage is limited to situations in which the salvor, through want of due care, has worsened the position of the victim."  *Id*. (quoting *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011, 1021-1022 (5th Cir. 1969), *cert. dismissed*, 396 U.S. 1033 (1970)).  Thus, in *Berg* the Ninth Circuit held that:

> the proper standard of care is that a rescuer will be held liable only (1) for negligent conduct that worsens the position of the victim or (2) for reckless and wanton conduct in performing the rescue.

*Id*. at 1430.  A private individual owes no affirmative duty to render assistance to a vessel in distress. *Wright v. U.S.*, 700 F. Supp. 490, 494 (N.D. Cal. 1988).  These rules apply to the Coast Guard by virtue of the SIAA, which, like the Federal Tort Claims Act ("FTCA"), "removes the government's traditional cloak of sovereign immunity from maritime tort liability and provides that suit may be brought against the United States 'where . . . if a private person or property were involved, a proceeding in admiralty could be maintained.'"  *Huber v. Monterey Navigation Co., Inc.*, 838 F.2d 398, 401 (9th Cir. 1988)(quoting 46 U.S.C. § 742).

5.      In the context of a rescue effort by the Coast Guard, courts have held that once the Coast Guard makes the decision to assist in a rescue effort, it may be held liable under the *Berg* standard for negligently abandoning the effort where doing so leaves those in distress in a worse position than they would have been had the Coast Guard declined to assist at the outset.  *See, e.g., Hurd v. United States*, 134 F. Supp. 2d 745 (D.S.C. 2001) (holding that Coast Guard was negligent where it decided to assist, leading others to abandon efforts to assist in the belief that the Coast Guard was handling the situation, then negligently abandoned the rescue effort); *U.S. v. DeVane*, 306 F.2d 182 (5th Cir. 1962) (holding that Coast Guard could be liable for abandoning rescue effort if it was found that in doing so, the Coast Guard worsened the position of those in distress by inducing reliance on the part of other potential rescuers).  Under this rule, it is the plaintiff's burden to prove that the Coast

16

1    Guard's negligence left the victim in a worse position than he would have been in had the Coast

2    Guard refrained from assisting.

3    6.      Plaintiff asks the Court to shift to the United States the burden of proof as to causation under

4    *Gardner v. National Bulk Carriers, Inc.*, 310 F.2d 284 (4th Cir. 1963).  In that case, the court

5    addressed the duty of a ship to use every reasonable means to save the life of a seaman who falls

6    overboard, referred to as the "rescue doctrine."  *Id*. at 286.  The court reasoned that "the burden of

7    the risk involved in the master's inaction must be cast by the law on him and the ship, and not on the

8    helpless man in the water" and therefore rejected the shipowner's argument that a wrongful death

9    claim failed because the decedent's widow could not prove that her husband was still alive when it

10   was discovered that he was missing.  *Id*. at 288.  Courts have, on limited occasion, extended the

11   *Gardner* rule beyond the original master-seaman scenario.  *See, e.g., Walsh v. Zuisei Kaiun K.K.*,

12   606 F.2d 259 (9th Cir. 1979)(holding that the *Gardner* presumption applied not only in the context

13   of a seaman whose employer violated the duty of rescue but also to a compulsory pilot who was

14   assisting the employer's ship).  However, Plaintiff has pointed to no case in which a court has

15   imposed such a presumption with respect to rescue efforts by a "Good Samaritan," including the

16   Coast Guard.  Therefore, the Court rejects Plaintiff's invitation to shift the burden of proof as to

17   causation to Defendant under *Gardner*.

18   7.      A threshold question in this case is whether the Coast Guard accepted a rescue mission in

19   connection with the suspected collision on July 13, 2007.  Whether the Coast Guard has accepted a

20   rescue mission in a particular case is a question for the trier-of-fact.  *Furka v. Great Lakes Dredge &*

21   *Dock Co.*, 755 F.2d 1085, 1088 (4th Cir. 1985).  The evidence in this case establishes that: 1) at least

22   two separate Coast Guard resources were dispatched to render assistance in this case, the MLB

23   47305, which was launched from Station Bodega Bay, and the cutter Hawksbill, which was diverted

24   from its ordinary patrol station outside the Golden Gate; 2) the Coast Guard instructed the rescue

25   helicopter from Air Station San Francisco to prepare for launch; 3) the Coast Guard began drafting

26   up a search plan; 4) the Coast Guard broadcast a UMIB and a SECURITE; and 5) the Coast Guard

27   briefed the command chain about the suspected collision.  On the basis of this evidence, the Court

28
                                                    17

1  concludes that the Coast Guard accepted a rescue mission in connection with the suspected collision

2  on July 13, 2007.

3  8.      The Court further finds that by terminating the mission, standing down its own assets,

4  allowing the Eva Danielsen to proceed, and making a broadcast that there was no vessel in distress –

5  a broadcast upon which fishing vessels very close to the scene of the collision relied in abandoning

6  their own efforts to assist – the Coast Guard worsened Mr. Wade's position.  Had those efforts

7  continued, as discussed above, it is more likely than not Mr. Wade would have been found alive and

8  rescued.  *See Hurd,* 134 F. Supp. 2d at 772-773.

9  9.      In light of the Court's conclusions that the Coast Guard accepted a rescue mission and that its

10  mistaken termination of that mission worsened Mr. Wade's position, the question upon which

11  Plaintiff's claim turns is whether the Coast Guard's conduct in connection with the rescue mission

12  was negligent.  This is a difficult question.  With the benefit of hindsight, it is apparent that the

13  Coast Guard was not provided with complete information.  In particular, the Captain of the Eva

14  Danielsen failed to inform  the Coast Guard that his Second Mate believed a collision had occurred

15  not only because the Eva Danielsen  had lost radio and radar contact with the Marja but also because

16  he had *seen* a mast ahead of the Eva Danielsen.  The Eva Danielsen's Captain failed to convey this

17  information to the Coast Guard even though VTS – at the instruction of Lt. Kirksey – asked him to

18  explain why he believed the Eva Danielsen had hit a fishing vessel.   Plaintiff asserts that this failure

19  was the result of negligence because the Coast Guard did not follow certain SOPs, which required,

20  Plaintiff contends, that SCC communicate directly with the Second Mate rather than through two

21  intermediaries – VTS and the Captain of the Eva Danielsen.

22        It is true that certain regulations and standard operating procedures were not followed to the

23  letter.  Plaintiff points, in particular, to provisions in the SOP Manual that emphasize the importance

24  of speaking directly to eyewitnesses and specifying that communications with the reporting ship be

25  conducted by the unit conducting the SAR operation, neither of which occurred in this case.  Those

26  provisions, however, are guidelines rather than rigid rules.  Thus, for example, the same SOP

27  provision that recommends that the unit responsible for prosecuting a case communicate directly

28                                                            18

**United States District Court**

For the Northern District of California

1   with a reporting source also recognizes that the unit receiving the call may be in a better position to

2   take the information.  That was the determination made here by Mr. Ford.  The Court cannot say that

3   in making this determination the Coast Guard failed to act with reasonable prudence under the

4   circumstances.  *See Schulz vs. Pennsylvania R. Co.*, 350 U.S. 523, 525 (1956)("negligence consists

5   of doing that which a person of reasonable prudence would not have done, or of failing to do that

6   which a person of reasonable prudence would have done under like circumstances.").  In reaching

7   this conclusion, the Court is mindful that its role is not to act as an "armchair admiral" in

8   determining whether a rescue attempt has been conducted negligently.  *Korpi v. U.S.*, 961 F.Supp.

9   1335, 1347 (N.D.Cal.,1997).  As the court explained in *Korpi*, "[t]he standard of care exhibited by

10   the rescuers is measured by the unique circumstances of the rescue.  *Id*. (citation omitted).  Thus,

11   "courts will not second guess the decisions made by rescue personnel in the midst of the rescue

12   attempt."  *Id*. (citation omitted).

13          Similarly, the Court does not find that Mr. Newsom's failure to speak with the Second Mate

14   was unreasonable under the circumstances.   The testimony establishes that it is customary and

15   appropriate for the Coast Guard to communicate with a vessel by talking to its master, even if the

16   master may be conveying information that he obtained from another seaman rather than firsthand.

17   While Mr. Newsom was aware that the master was not on the bridge at the time of the relevant

18   events, he had no reason to suspect the accuracy of the information that the master was providing

19   him.  The master had, after all, reported the suspected collision promptly and turned the ship around

20   to return to the scene.  Based on the information available at the time, it appeared that the master

21   was acting in good faith and had no reason to conceal relevant information.[4]  Nor did his

22   _____

23          [4]The Court also notes that it is not clear that the outcome would have been different even *had*

24   the Coast Guard spoken directly to the Second Mate.  Although the Second Mate wrote in his statement
     that he had seen a mast ahead of the Eva Danielsen, he also stated that at the time he changed course
     to pass the Marja there were  two vessels on the radar close to the Eva Danielsen.  Once he heard from

25   the Marja that the other boat was likely the Rogue, and once the Rogue reported that it was safe, it is
     possible that the Second Mate himself concluded that he had been mistaken and that the Eva Danielsen

26   had simply passed very close to the vessel whose mast he saw.  Thus, the assertion that the Coast Guard
     was negligent because it failed to comply with the SOPs that required the SAR team to speak directly

27   to eyewitnesses presents another problem for Plaintiff's case, namely, causation.  The Court concludes

28                                                      19

communications suggest that he did not have the requisite information to answer the questions posed to him by the Coast Guard.  To the contrary, he stated definitively that there had been no impact and that the only reason he and his Second Mate believed a vessel had been struck was because they lost the Marja's radio signal and it disappeared from radar after the Eva Danielsen changed course to pass that vessel.  A reasonably prudent person under the circumstances would have relied on those communications.

## IV.     CONCLUSION

The Court concludes that the Coast Guard did not conduct its rescue effort negligently and therefore is not liable.

Dated:  June 6, 2012

_____
JOSEPH C. SPERO
United States Magistrate Judge

---

that Plaintiff has not presented sufficient evidence to demonstrate that the failure to comply with the SOPs caused the Coast Guard to terminate the search operation, which in turn worsened the position of Mr. Wade.